UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BURT ARTHUR JORDAN, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>EASTERN MAINE MEDICAL CENTER d/b/a )<br>NORTHERN LIGHT EASTERN MAINE )<br>MEDICAL CENTER and DR. JAMES )<br>CLARKE, )<br>Defendants. ) | Civil Action No. 1:21-cv-34-DBH |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

Defendants Eastern Maine Medical Center d/b/a Northern Light Eastern Maine Medical Center ("EMMC") and Dr. James Clarke move pursuant to F.R.C.P. 56 for summary judgment on each of the claims asserted in Plaintiff's complaint for the reasons set forth below.[1]

**INTRODUCTION**

Plaintiff's complaint, liberally construed, asserts three causes of action: whistleblower retaliation, breach of EMMC's Medical Staff Bylaws (the "Bylaws") as they relate to peer reviews and corrective action investigations, and defamation in the form of false reports to the National Practitioner Databank and the Maine Board of Dental Practice. These claims arising from a peer review and corrective action investigation into Plaintiff's competency that occurred in 2016 and early 2017. Putting aside the utter frivolousness of Plaintiff's allegations,

---

[1] On July 26, 2021, Plaintiff filed an "Amendment of Pleadings" which the Court deemed a motion for leave to file an amended complaint. [ECF No. 13.] As will be set forth in Defendants' Opposition to Plaintiff's motion, leave should be denied because Plaintiff's proposed amended complaint is woefully deficient such that amendment would be futile. The proposed amended complaint asserts a claim for whistleblower retaliation, which was asserted in his initial complaint. The other "claims" -- fraudulent concealment/equitable estoppel and continuous wrongs – are actually defenses to Defendants' statute of limitations defense. Those defenses will be addressed herein in order that this matter be resolved as efficiently as possible.

Defendants are entitled to summary judgment on all claims because they run afoul of the applicable statutes of limitations and are unsupported by any evidence. Moreover, Defendants are immune from liability for the claims under Federal law.

Specifically, Defendants are entitled to judgment on Plaintiff's whistleblower retaliation claim because Plaintiff failed to file his claim with the Maine Human Rights Commission, significantly limiting any recoverable damages, and then failed to file a complaint for any residual recoverable damages within the applicable two-year statute of limitations. Plaintiff's defamation claim fails because it is also subject to a two-year statute of limitations. Plaintiff's breach of contract claim fails because he cannot point to any provision of the Bylaws that was breached and because the federal Health Care Quality Improvement Act ("HCQIA") provides broad immunity for entities and individuals involved in peer review and corrective action investigations.

## STATEMENT OF FACTS

Plaintiff is a pediatric dentist who joined the medical staff of EMMC in June 2013. Def.'s Statement of Undisputed Material Facts, filed herewith ("SUMF") at ¶ 1. Plaintiff specialized in surgical pediatric dentistry -- treating patients who could not be treated in an office setting for a variety of reasons. While practicing at EMMC, Plaintiff split his time between Maine and Miami, Florida, where he also practiced pediatric dentistry. SUMF ¶ 2.

### A. Investigation into Plaintiff's Patient Care and Termination of His Membership in EMMC's Medical Staff

In May 2016, one of EMMC's pediatric dentists, Dr. Marcus Wilkerson, approached Dr. Clarke, who was then Chief of Surgery, with concerns regarding Plaintiff's care. Dr. Wilkerson has extensive training in pediatric dentistry and is a well-respected member of EMMC's medical staff. SUMF ¶ 3. Dr. Wilkerson reported that his practice had seen a number of Plaintiff's

former patients and that those patients required remedial work following surgery by Plaintiff. Dr. Wilkerson reported that he reviewed these patients' files and believed that the care that had been provided by Plaintiff was deficient. SUMF ¶ 4.

Dr. Clarke brought Dr. Wilkerson's concerns to EMMC's Chief Medical Officer, Dr. James Raczek. Dr. Raczek recommended that Dr. Clarke conduct a peer review of a selection of Plaintiff's cases. SUMF ¶ 5. On May 26, 2016, Dr. Clark had a telephone call with Plaintiff to inform him that the peer review would take place on June 9, 2016. Plaintiff was encouraged to attend the peer review and told that, to the extent he was not available, the results of the peer review would be shared with him. Plaintiff was also sent a list of the cases that would be discussed during the peer review. SUMF ¶ 6.

Thereafter, Plaintiff engaged William Palmer, a Bangor attorney, to represent him with respect to the peer review process. Attorney Palmer contacted Dr. Clarke's office to advise that Dr. Jordan was not available on June 9 and to request that the peer review be rescheduled to a date convenient to Dr. Jordan. SUMF ¶ 7. In light of the schedules of the other participating physicians, Dr. Clarke proceeded with the first of two peer review sessions on June 9 and had a follow-up peer review session on June 21, 2016. SUMF ¶ 8.

During the peer review, a number of Plaintiff's cases were discussed, with four cases discussed in detail. The peer review raised significant concerns regarding Plaintiff's patient care. It concluded that the quality of Plaintiff's care was substandard, and that Plaintiff's documentation was poor and often reflected more work than was actually performed. SUMF ¶ 9.

Dr. Clarke discussed the results of the peer review with Plaintiff on June 27. Dr. Clarke informed Plaintiff that the peer review raised questions concerning the quality of Plaintiff's care and that an external peer review would be performed to further explore the issues that arose

3

during the internal peer review. Dr. Clarke informed Plaintiff that he would be provided with the results of the external peer review once it was completed. SUMF ¶ 10.

The external peer review was conducted through the Maine Medical Association External Peer Review Program. The external peer review examined the records of 15 of Plaintiff's patients, which constituted approximately 10% of the patients treated by Plaintiff at EMMC. A report of the external peer review was issued on October 6, 2016. SUMF ¶¶ 11-12. It noted that the external reviewers "were very concerned by the dental care provided by Dr. Jordan." It also noted that

> the quality of Dr. Jordan's pulpotomies, a standard treatment in pediatric dentistry, consistently appeared below the standard of care for a pediatric dentist. There are a number of issues related to misdiagnosis. There may also be issue with over-treatment related to completing pulpotomies on every tooth that received a stainless steel crown. The overall assessment was that Dr. Jordan was providing poor quality dental care to his patients.

SUMF ¶ 12. The external peer review report was provided to EMMC's Medical Executive Committee's ("MEC") Professional Competence Committee, which determined that Plaintiff's privileges should be summarily suspended pending further consideration by the MEC. SUMF ¶ 13.

On October 11, 2016, Dr. Raczek sent a letter to Dr. Jordan enclosing the external peer review report, notifying Plaintiff of the summary suspension and stating that the MEC would be meeting to determine whether to cancel the summary suspension or proceed with a corrective action investigation. SUMF ¶ 14. The MEC met on October 11, 2016, and determined that an investigation into Plaintiff's satisfaction of the qualifications and responsibilities of Medical Staff membership and clinical privileges. SUMF ¶ 15. The MEC's request was forwarded to the President of EMMC's Medical Staff, who thereafter convened an Ad Hoc Investigation

4

Committee (the "Committee") to conduct the investigation. SUMF ¶ 16. Plaintiff was notified of the MEC's decision and the convening of the Committee by letter dated October 13, 2016. SUMF ¶ 13.

The Committee met on October 19 and 20 and November 1, 2016. The Committee's work during those meetings was documented in detail in minutes taken at each meeting. SUMF ¶ 17. The Committee reviewed the conclusions of the internal and external peer reviews, reviewed particular cases in detail and interviewed the individuals involved with the internal peer review. SUMF ¶ 17. On November 1, 2016, the Committee interviewed Plaintiff. In advance of that interview, the Committee provided Plaintiff with a copy of the Bylaws, medical records for the cases that were the subject of the internal and external peer reviews and radiographs associated those cases, among other information. SUMF ¶ 18. After the interview, the Committee considered the information it gathered and voted unanimously to continue the summary suspension of Plaintiff's privileges. SUMF ¶ 19.

The Committee issued a report of its investigation on November 2, 2016. The Committee concluded that its review of Plaintiff's cases demonstrated "issues of significant clinical concern" and that the concerns were "rampant throughout all of the cases reviewed." The Committee recommended revoking Plaintiff's staff membership and clinical privileges. Plaintiff was provided with a copy of the Committee's report by letter dated November 2, 2016.

The Committee's report was presented to the MEC on November 9, 2016. SUMF ¶ 20. The MEC voted to continue Plaintiff's summary suspension and to recommend to EMMC's Board of Trustees that Plaintiff's medical staff privileges be revoked. SUMF ¶ 20. Plaintiff was advised of the MEC's decision by letter dated November 10, 2016. That letter, which was deemed a Special Notice under EMMC's Bylaws, informed Plaintiff of his rights under the

5

Bylaws to request a hearing regarding the MEC's decision and that Plaintiff's failure to request a hearing would constitute a waiver of his right to a hearing or appellate review. The letter also advised Plaintiff of other rights afforded by the Bylaws. SUMF ¶ 23.

Dr. Jordan did not request a hearing. SUMF ¶ 24.

On January 25, 2017, after Plaintiff's 30-day period to request a hearing to challenge his summary suspension had passed, EMMC's Board of Trustees convened to consider the recommendations of the MEC. The Board of Trustees voted to revoke Plaintiff's membership in the medical staff and clinical privileges. SUMF ¶ 25.

### B.    The Bylaws

The Bylaws in effect at the time of the Committee's investigation govern corrective action investigations. The Bylaws do not address the peer review process, and provide no specific rights to the subject of peer reviews. SUMF ¶ 26.

With respect to corrective action investigations, the Bylaws provide for a multi-step process. When a practitioner's "satisfaction of the qualifications and responsibilities of the Medical Staff Membership or Clinical Privileges" – which include providing quality medical care – have been brought into question, the Chief of Service (Dr. Clarke in this instance) must review and discuss the allegations and supporting documentation with the practitioner. If, after this preliminary review, the Chief of Service has reasonable cause to question the practitioner's "satisfaction of the qualifications and responsibilities of the Medical Staff Membership or Clinical Privileges," he may request an investigation. SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.2).

Within five days of such a request, the President of the Medical Staff must appoint an Ad Hoc Investigation Committee. SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.4). The

Committee must then review all relevant evidence and interview individuals identified to have pertinent information. The practitioner that is the subject of the investigation "shall have an opportunity for an interview by the ad hoc Investigation Committee and may furnish any relevant materials." SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.4-2). The Bylaws specifically provide that "this interview shall not constitute a hearing and shall be preliminary in nature. None of the procedural rules provided in these Bylaws with respect to hearings shall apply thereto." *Id.* The Bylaws also provide that "neither the Investigating Committee nor the Practitioner who is the subject of the investigation shall have the right to have legal representation present during the ad hoc Investigating Committee meetings." SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.4-4).

Thereafter, the ad hoc Investigation Committee must issue a written report with recommendations, which is to be reviewed by the Medical Executive Committee. SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.4-3). The Executive Committee determines the appropriate action to take and notice of the Executive Committee's decision is provided to the practitioner. SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.5).

In the event that the Executive Committee decides to terminate a practitioner's clinical privileges – as occurred with respect to Plaintiff – the practitioner must be notified of his or her right to request a hearing on the proposed action. SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 6.5-2). The practitioner must request the hearing within 30 days, and the practitioner's failure to request a hearing "shall be deemed a waiver of [the Practitioner's] rights to such a hearing and to an appellate review to he/she might otherwise have been entitled on the matter." SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at §§ 7.4, 7.5).

The Bylaws set forth the specific process and the rights of the practitioner in the event a hearing is requested. These rights include being represented by counsel, the calling and examining witnesses and introducing evidence. All hearings must be conducted "in accordance with the procedural safeguards set forth in this Article [of the Bylaws] to assure the affected Practitioner is accorded all rights to which he or she is entitled." SUMF ¶ 26 (Ex. 19 to the Clarke Decl. at § 7.2-2).

### C. Notice to the NPDB and Maine Board of Dental Practice

Federal and state law require that health care entities provide certain notices of specified adverse actions. HCQIA established the National Practitioner Databank ("NPDB") to track malpractice claims and other adverse actions involving health care providers. Where a health care entity "takes a professional review action that adversely affects the clinical privileges of a physician for a period of longer than 30 days" it must submit notice of that action to the NPDB. *See* 42 U.S.C. § 11133(a)(1)(A). Similarly, Maine law requires that a health care entity:

> report in writing to the disciplined practitioner's board or authority the name of any licensed, certified or registered employee or person privileged by the provider or entity whose employment, including employment through a 3rd party, or privileges have been revoked, suspended, limited or terminated

24 M.R.S.A. § 2506.

As discussed above, on November 9, 2016, the MEC voted to continue the summary suspension of Plaintiff's privileges and to recommend to the Board of Trustees that Plaintiff's membership in the medical staff and privileges be permanently revoked. SUMF ¶ 22. Because this action constituted a suspension of Plaintiff's privileges, the action was reported to the Maine Board of Dental Practice and the NPDB that same day. SUMF ¶ 28. These notices were later updated to reflect the decision of EMMC's Board of Trustees. SUMF ¶ 29.

Plaintiff submitted statements challenging EMMC's reports to the NPDB, stating that Plaintiff's due process rights had been violated and that EMMC's decision was therefore invalid. SUMF ¶¶ 28-29 (Clarke Decl. Exs. 20, 22).

### D.     Plaintiff's Complaint

Plaintiff filed the instant action on April 9, 2021. Plaintiff's statement of claim alleges the following:

1. Defendants EMMC, Dr. Clarke, et al., by a total lack of due process, conspired to both injure the Plaintiff and the patients who he would treat (2016-2017).

2. Defendants EMMC, Dr. Clarke, et al. conspired to silence plaintiff from exposing a widespread hospital practice that was and is potentially dangerous to patients' health and safety.

3. Defendants EMMC, Dr. Clark, et al. conspired to effect damages to plaintiff by a series of secret meetings not announced to plaintiff.

4. Defendants EMMC, Dr. Clarke et al. reported allegations against plaintiff to the National Practitioner Data Bank and the Maine Board of Dentistry when they knew or should have known that their allegations were unfounded.

5. Discovery may show that defendants' EMMC, Dr. Clarke, et al. actions were motivated by more than hiding from public awareness a potentially dangerous hospital practice. It may also show that false claims acts were involved.

Read most liberally, Plaintiff's complaint asserts causes of action for defamation (statement 4) and whistleblower retaliation (statements 2 and 5). According to Plaintiff's responses to Defendants' Interrogatories, in two meetings in May-June 2016, Plaintiff alerted defendant Clarke to the allegedly dangerous practice of switching scrub nurses during cases in the operating room.

Statements 1 and 3 assert claims for violation of due process rights. In these statements, Plaintiff alleges that Defendants held secret meetings as part of the peer review and investigation process. In his Responses to Defendants' Interrogatories, Plaintiff alleges that the peer review

was conducted without him present and that neither Plaintiff nor his attorney were invited to attend certain meetings of the Committee. He also alleges that he was "not able to challenge the veracity of any information given to the Committee" when he was interviewed by the Committee on November 1, 2016. Because Plaintiff has no constitutional due process right with respect to EMMC's peer review, investigation and decision to terminate Plaintiff's privileges, we assume statements 1 and 3 allege a breach of EMMC's Medical Staff bylaws, which afford certain rights to subjects of corrective action investigations.

In his proposed amended pleading, Plaintiff asserts defenses of fraudulent concealment/equitable estoppel and continuous wrongs.

## ARGUMENT

Defendants are entitled to summary judgment if there is no genuine issue of material fact, and it is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In determining if there is a genuine issue of material fact, the Court must examine the record "in the light most flattering to the nonmovant," *Cadle Co. v. Hayes*, 116 F.3d 957, 959-60 (1st Cir. 1997), but "establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise." *Id*. "If the evidence adduced in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 960. Most important, summary judgment is warranted where the plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof. *Unobskey Corp v. Marchin Ltd.*, 521 F. Supp. 2d 114, 118-19 (D. Me. 2007).

## I.  PLAINTIFF'S CLAIMS FOR WHISTLEBLOWER RETALIATION AND DEFAMATION ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS.

### A.  Plaintiff's Whistleblower Retaliation Claim is Time-Barred.

In addition to being utterly without factual merit – there is no evidence whatsoever that Plaintiff's privileges and staff membership were terminated for any reason other than his lack of competence – Plaintiff's claim is barred by the applicable statute of limitations. In order to claim attorneys' fees, compensatory damages and the other categories of damages set forth in 5 M.R.S.A. § 4613, a claim for violation of Maine Whistleblower Protection Act must be filed with the Maine Human Rights Commission ("MHRC") within 300 days of the violation. *See* 5 M.R.S. §§ 4611 ("a complaint must be filed with the commission not more than 300 days after the alleged act of unlawful discrimination"); 5 M.R.S.A. § 4622 ("Attorney's fees under section 4614 and civil penal damages or compensatory and punitive damages under section 4613 may not be awarded to a plaintiff in a civil action under this Act unless the plaintiff alleges and establishes that, prior to the filing of the civil action, the plaintiff first filed a complaint with the commission"). A complaint that is not first filed with the MHRC must be filed within two years of the alleged violation and is then limited to certain categories of damages. *See Harris v. International Paper Co.*, 765 F. Supp. 1509, 1525 (D. Me. 1991) (holding that where a complaint is not first filed with the MHRC, the court "may award only 'make whole' relief which directly remedies the effects of Defendant's discriminatory acts and ensures that Defendant's discrimination against Plaintiffs will not recur").

Plaintiff claims that he raised the allegedly dangerous practice of switching scrub nurses during operating room cases in May and June of 2016.[2] The alleged retaliatory actions – the peer

---

[2] While not relevant to this motion, Defendant Clarke has no recollection of Plaintiff raising this issue. More significantly, Defendants deny that the practice described is dangerous. It is a common practice for nurses and other

11

review, corrective action investigation, termination of Plaintiff's staff membership and privileges and reports to the NPDB and Maine Board of Dental Practice -- occurred in 2016 and early 2017. Using EMMC's final report to the NPDB on February 16, 2017, as the last alleged retaliatory action, Plaintiff's time to file a complaint based upon these actions with the MHRC ran on December 13, 2017.[3] Having failed to file such a claim, Plaintiff's time to file a complaint seeking "make whole" damages ran on February 16, 2019, over two years before this action was commenced. For this reason, the Court should grant summary judgment on Plaintiff's whistleblower retaliation claim.

### B. Plaintiff's Defamation Claim Is Time Barred.

An action for defamation must be filed within two years after the cause of action accrues. *See* 14 M.R.S.A. § 753; *Bloomquist v. Albee*, No. Civ. 03–276–P–S, 2004 WL 2203469, at *2 (D. Me. Sept. 29, 2004). Plaintiff alleges that the internal and external peer review reports and the report of the Committee contained defamatory statements. He also claims that the reports to the Maine Board of Dental Practice and NPDB were "unfounded." Plaintiff received contemporaneous notice of all of the alleged defamatory statements as he was provided with the peer review reports and Committee Report and received notice of the Board and NPDB filings.

Plaintiff had two years from the date of these allegedly defamatory statements to commence his action. His time to assert claims based on the internal and external peer review reports and Committee report ran as of November 2018, and his deadline to assert claims based

---

operating room staff to be changed during cases and can and does occur safely at EMMC and other hospitals across the country.

[3] Plaintiff was notified of the NPDB filing, as evidenced by his objections to the report, reflected in the body of the report itself.

on NPDB and NPDB notices ran as of February 2019. Accordingly, Plaintiff's claim for defamation is time barred, and summary judgment should be granted in Defendants' favor.

### C. Plaintiff Cannot Establish Fraudulent Concealment/Equitable Estoppel or Continuous Wrongs.

Plaintiff's proposed amended complaint alleges that the applicable statutes of limitations are tolled by virtue of fraudulent concealment, equitable estoppel and continuous wrongs. Plaintiff can point to no evidence to support these defenses.

Fraudulent concealment can toll a statute of limitations where the defendant conceals the existence of the cause of action. *See Bozzuto v. Ouellette*, 408 A.2d 697, 699 (Me. 1979). There was no fraudulent concealment in this case. Plaintiff was notified of every action that led to the termination of his privileges and staff membership. He had every opportunity to request a hearing to contest that termination by requesting a hearing or by commencing an action to the extent he believed those actions constituted whistleblower retaliation or contained defamatory statements. Nor can Plaintiff point to any facts that should cause the Court to exercise any right to toll those statutes.

There are also no facts to support a theory of continuous wrongs. Once Plaintiff's privileges and staff membership were terminated and reports were made to the Maine Board of Dental Practice and NPDB, its actions vis-à-vis Plaintiff ceased. In sum, there is no support for tolling of the statute of limitations.

## II. DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFF'S DUE PROCESS CLAIM BECAUSE HE CANNOT POINT TO ANY DUE PROCESS RIGHT THAT WAS VIOLATED AND BECAUSE DEFENDANTS ARE IMMUNE FROM LIABILITY FOR THEIR PEER REVIEW-RELATED ACTIONS.

### A. Plaintiff Cannot Point to Any Evidence to Establish a Breach of a Due Process Right.

Plaintiff alleges that Defendants conspired to deprive him of due process by holding secret meetings, not providing notice of other meetings, and not offering an adequate notice to be heard. As Defendant is not a government actor, Plaintiff has no constitutional due process rights with respect to the peer review and investigation. *See Tirado-Menendez v. Hospital Interamericano de Medicina*, 476 F. Supp. 2d 79, 83 (D.P.R. 2007) (holding that plaintiff had no constitutional rights vis-à-vis the defendant hospital's peer review because the hospital was not public and was not a government actor). Assuming, *arguendo*, that the Bylaws constitute a contract between Plaintiff and EMMC, Plaintiff's only "due process rights" are the rights he is provided under the Bylaws with respect to the conduct of peer reviews and corrective action investigations.

Plaintiff has not – and cannot – point to any evidence that Defendants breached the Bylaws in their handling of the peer review and corrective action investigation. With respect to the peer review, the Bylaws are silent as to the practitioner's right to be present, and there is no basis for concluding that Plaintiff had such right. Plaintiff was informed of the date upon which the peer review was scheduled to occur, invited to participate, and told that if he could not participate, the results would be discussed with him. While Plaintiff, through counsel, requested that the peer review be rescheduled to a date convenient to Plaintiff, Defendants had no obligation to accommodate Plaintiff's request.

Nor can Plaintiff point to any evidence that he received less than the required "due process" during the investigation. Because the investigation process is intended to be

14

preliminary and non-adversarial, the Bylaws provide for limited "due process" during an investigation. The Bylaws provide that the subject of the investigation "shall have an opportunity for an interview and may furnish relevant materials," but also makes clear that the interview does not constitute a hearing, that none of the procedural rules with respect to hearing apply and that the practitioner does not have the right to have legal counsel present during the interview. The hearing process affords these rights, but Plaintiff opted not to request a hearing.

      The Committee provided Plaintiff all of the "process" afforded by the Bylaws. Plaintiff was informed that the Committee had been formed and would be investigating the need for corrective action. Plaintiff was invited to be interviewed by the Committee and, in advance of that interview, was provided with a copy of the Bylaws, medical records for the cases that were the subject of the internal and external peer reviews, radiographs associated with those cases, and other information that Plaintiff requested. When interviewed, Plaintiff was asked numerous questions regarding his practices and the particular cases addressed in the peer reviews. Plaintiff's assertion that, during the interview, he was "not able to challenge the veracity of any information given to the Committee" is patently false – Plaintiff was provided with the medical records for each of the cases discussed by the Committee and, during the interview, was asked "what else would you like us to know?" In response, and despite the fact that he had been provided the internal peer report on August 18 and the external peer report on October 11, 2016, Plaintiff stated, "I have had no time to deal with this." He added that he "plan[ned] to review everything" and that the Committee could "count on [him] doing exhaustive research and dig in completely." If Plaintiff performed that research and review, it was unknown to the Committee because Plaintiff provided no further information following his interview.

In short, there is no genuine issue of material fact with respect to Defendants' alleged breach of the Bylaws, and for that reason summary judgment on Plaintiff's breach of contract/due process claim should be granted.

### B. Defendants Are Entitled to Immunity Under HCQIA.

In 1986, Congress passed HCQIA to "encourage the type of peer review that would expose incompetent physicians." *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 31 (2002). In addition to creating the NPDB, HCQIA "shields health care entities and individual physicians from liability for damages for actions performed in the course of monitoring the competence of health care personnel." *Id.* (*citing Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996), and *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir. 1994)).

HCQIA provides that a health care entity's competency review shall not result in its liability "in damages under any law of the United States or of any State," if such a peer review "meets all the standards specified in section 11112(a) of this title." 42 U.S.C. § 11111(a). Section 11112(a) provides that:

> a professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this

> title unless the presumption is rebutted by a preponderance of the evidence.[4]

The presumption that the professional review body has met the statutory requirements unless rebutted by a preponderance of the evidence alters the typical summary judgment scenario "such that the burden lies with [the practitioner] to show that [reviewing entity] failed to comply with the § 11112 requirements and that it is not consequently entitled to the HCQIA's grant of immunity." *Benjamin v. Aroostook Med. Ctr.*, 937 F. Supp. 957, 973 (D. Me. 1996).

There is no genuine issue of material fact that Defendants satisfied these standards. First, Defendants clearly believed that the peer reviews and investigations were in the furtherance of quality health care. Concerns regarding Plaintiff's care were raised by a colleague with expertise in pediatric dentistry and were substantiated by both an internal and external peer review.

Second, there is no genuine issue as to whether Defendants made a reasonable effort to obtain the facts relating to Plaintiff's care. Defendants conducted an internal peer review and an external review through the Maine Medical Association's External Peer Review Program and then appointed the Committee to further review the allegations. That Committee interviewed individuals involved in the internal and external peer reviews, reviewed the medical records of the cases at issue, and interviewed Plaintiff.

Courts have granted summary judgment on HCQIA immunity where health care entities undertook similar efforts. In *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 637 (3rd Cir.1996), the Third Circuit upheld a grant of summary judgment to the defendant hospital where the hospital restricted the plaintiff's privileges based on recommendations from two peer

---

[4] The notice and hearing obligations set forth in Section 11112 do not create a cause of action for failure to provide adequate due process, they are merely conditions that must be satisfied to receive HCQIA's grant of immunity for peer review actions. *See Hancock v. Blue Cross-Blue Shield of Kansas, Inc.*, 21 F.3d 373, 374 (10th Cir. 1994) (holding that HCQIA does not create a cause of action in favor of a physician).

reviews. Holding that Section 11112 entitles a practitioner to "a reasonable effort, not a perfect effort," the court in *Poliner v. Texas Health Systems*, 537 F.3d 368, 380 (5th Cir. 2008), reversed a jury's award and granted judgment for the defendant hospital where the plaintiff's privileges were suspended based upon an ad hoc committee's review of a sample of the plaintiff's cases. The plaintiff had been invited to attend and be interviewed by the ad hoc committee, but declined, claiming that he had not had adequate time to review the patients' files. *Id.* at 373. *See also Benjamin v. Aroostook Med. Ctr.*, 937 F. Supp. at 973 (granting summary judgment to defendant hospital after finding that the plaintiff had failed to meet his burden of establishing that defendant had not taken reasonable efforts).

Third, there is no genuine material issue of fact as to whether Plaintiff was afforded adequate notice and hearing procedures. Here, "[t]he controlling question is whether the plaintiff 'has shown by a preponderance of the evidence, that the defendant[ ] did not provide him with fair and adequate process under the circumstances.'" *Singh*, 308 F. 3d at 40 (quoting *Islami v. Covenant Med. Ctr. Inc.*, 822 F. Supp. 1361, 1377 (N.D. Iowa 1992)). Plaintiff was provided notice of each of the peer reviews as well as the results of those reviews. He was interviewed by the Committee and invited to advise them of all pertinent information. Moreover, he was advised of his right to request a full hearing regarding the termination of his privileges – a right he affirmatively waived. *See Brader v. Allegheny General Hosp.*, 167 F.3d 832, 842 (3rd Cir. 1999) (finding this prong satisfied where the hospital gave "notice of each professional review action to be taken, informing him of his due process rights and the time in which he had to request a hearing"). Any lack of process is due solely to Plaintiff's decision not to avail himself of the process that was afforded to him. Accordingly, Plaintiff cannot meet his burden of establishing that he was afforded adequate notice and hearing procedures.

18

Finally, there is no genuine question that the termination of Plaintiff's privileges and staff membership were based on "the reasonable belief that the action was warranted by the facts known" after meeting the notice and hearing requirements of paragraph (3) of Section 1112. The evidence considered by the Committee, the MEC and the Board of Trustees reflected substantial concerns with Plaintiff's patient care. The internal peer review concluded that Plaintiff's work was "substandard" and that there was a "pattern of poor documentation." The external peer review concluded that the "outside reviewers were very concerned by the dental care provided by" Plaintiff and "very poor dentistry overall." The Committee found that the 15 cases reviewed all "demonstrate[d] issues of significant clinical concerns" including poor pre-surgical care and planning due to lack of appropriate radiologic studies, overtreatment and undertreatment of cavities noted on x-rays but not treated and damage to adjacent teeth. There can be no question that these facts created a reasonable belief that revoking Plaintiff's clinical privileges and staff privileges was warranted.

In sum, there is no genuine issue of material facts as to Defendants' satisfaction of the conditions set forth in Section 11112, and they are, therefore, entitled to immunity from Plaintiff's claims.

## CONCLUSION

For the reasons set forth herein, the Court should grant summary judgment in Defendants' favor on all claims asserted in Plaintiff's complaint.

Dated:  August 10, 2021	Respectfully submitted,

EASTERN MAINE MEDICAL CENTER AND
DR. JAMES CLARKE

By their Attorneys,

/s/ Rachel M. Wertheimer
Karen Frink Wolf
Rachel M. Wertheimer
VERRILL DANA, LLP
One Portland Square
Portland, ME 04101-4054
(207) 774-4000
kwolf@verrill-law.com
rwertheimer@verrill-law.com

## CERTIFICATE OF SERVICE

I hereby certify that I emailed and mailed via US Mail this document to the following on August 10, 2021:

Burt Arthur Jordan
9751 East Bay Harbor Drive
#1204
Bay Harbor Islands, FL 33154
flkidsdental@protonmail.com

/s/ Rachel M. Wertheimer

15119027_2